**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| IN RE APPLICATIONS FOR CRIMINAL COMPLAINT, ARREST WARRANTS, AND SEARCH WARRANTS | : 3:24-mj-_____ (RMS) |
| | : |
| | : **FILED UNDER SEAL** |
| | : |
| | : May 3, 2024 |

**MASTER AFFIDAVIT IN SUPPORT OF COMPLAINT,**
**ARREST WARRANT AND SEARCH WARRANTS**

     I, Alex MacNamara, being duly sworn, do depose and say:

**I.      INTRODUCTION**

     1.      I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

     2.      I am a Special Agent with the Drug Enforcement Administration ("DEA"), United States Department of Justice.  I am currently assigned to the New Haven District Office ("NHDO") and have been since August 7, 2022.  In my capacity as a Special Agent with the DEA, I am a participating member of the Organized Crime Drug Enforcement Task Force ("Task Force"), which is comprised of personnel from federal, state, and local law enforcement agencies.

     3.      Prior to my assignment to the NHDO, I successfully completed a 17-week DEA training academy in Quantico, VA.  Over the course of the academy, I was trained in the use/management of confidential sources, surveillance, undercover operations, tactical operations, drug identification, federal criminal law, and a variety of specific topics related to drug trafficking.

     4.      I was previously a sworn member of the Fairfield Police Department from December 27, 2018, through March 27, 2022. I have participated in numerous criminal

1

investigations involving violations of local criminal law.  Pursuant to my participation in those investigations, I have performed various tasks which include, but are not limited to: (a) conducting traffic stops of individuals in possession of narcotics (b) interviewing witnesses, victims, and suspects during the course of calls for service (c) assisting in the execution of and application for search and arrest warrants (d) conducting surveillance in relation to criminal complaints and problem areas in a local law enforcement capacity.

5.      As part of my duties, I am conducting an investigation, together with other law enforcement officers, into suspected criminal activity, including drug trafficking and related offenses, in and around New Haven County, by Donald Charmaine OGMAN (YOB 1981) and others known and unknown.

6.      I am a co-case agent directing the investigation that is the subject of this affidavit. I have personally participated in the investigation of the offenses that are the subject of this affidavit.  The statements contained in this affidavit are based, in part, upon my personal knowledge and, in part, upon sources of information and belief.  The investigation has employed several different investigative techniques, including, but not limited to:

    a.   information, and oral and written reports, regarding this and other investigations which your affiant has received, directly or indirectly, from law enforcement authorities, including, but not limited to, Special Agents of the DEA, sworn members of the Task Force, other federal authorities, and detectives and officers of area police departments;

    b.   the examination of records, including financial records, call detail records and motor vehicle records;

    c.   the use of pen registers and trap-and-trace devices;

2

    d.   the obtaining of precise location information;

    e.   physical surveillance and the use of pole cameras;

    f.   controlled purchases of drugs;

    g.   trash pulls; and

    h.   other information, including information obtained from confidential sources, that your affiant has reviewed and determined to be accurate and reliable.

7.    Based upon information known to me as a result of my participation in this investigation, as well as information, which I have determined to be accurate and reliable, provided to me by other law enforcement officers, including my co-case agents in this investigation, I am familiar with the information discussed herein.   Where the contents of documents, or communications with others, are reported herein, they are set forth in substance and part, unless otherwise indicated.

8.    This affidavit is being submitted in support of applications for a complaint and arrest warrant for OGMAN for violations of Title 21.   This affidavit is also being submitted in support of applications for warrants to search multiple locations, described more fully below and throughout this affidavit as the "**SUBJECT PREMISES 1**" and "**SUBJECT PREMISES 2**." This affidavit is also being submitted in support of an application for a warrant to search two cellular telephones being utilized by OGMAN  in connection with his drug trafficking activities, described more fully below and throughout this affidavit as "**TARGET TELEPHONE 1**" and "**TARGET TELEPHONE 2**."

9.    As discussed more fully below, there is probable cause to believe, and I do believe, that OGMAN has committed drug trafficking offenses in violation of Title 21 U.S.C. Sections 841(a)(1), (b)(1)(B), and (b)(1)(C), and 843, to wit, possession with intent to distribute, and

distribution of controlled substances, including but not limited to methamphetamine and cocaine, and use of a telephone in furtherance of a drug trafficking offense, and that fruits, instrumentalities (hereinafter, the "**Target Offenses**"), and evidence of these violations, as described herein and in Attachments B-1 through B-4, including but not limited to quantities of said controlled substances, or residue of these substances, drug paraphernalia, drug packaging materials, cash deriving from the sale of drugs, and/or documents and records relating to the aforementioned offenses, including records stored in electronic form, as well as telephones utilized in furtherance of these offenses, will be found within the **SUBJECT PREMISES 1, SUBJECT PREMISES 2, TARGET TELEPHONE 1,** and **TARGET TELEPHONE 2** as described herein and in Attachments A-1 through A-4.

10.     Accordingly, this affidavit is being submitted in support of a criminal complaint and arrest warrant for OGMAN and to secure search warrants at the following locations which are the residence of the primary subject in this investigation and an identified stash location, both of which are being used in furtherance of the **Target Offenses**, and for the two cellular phones, which OGMAN uses interchangeably, in furtherance of the **Target Offenses**:

     a. **SUBJECT PREMISES 1** is the second floor apartment of a three-story light-colored building located at 429 Shelton Avenue, New Haven, Connecticut.  The entrance to the second story of the building is located through the left door marked "429." Based on the information set forth in this affidavit, **SUBJECT PREMISES 1** is believed to be a stash location/distribution area utilized by OGMAN.

     b. **SUBJECT PREMISES 2** is the second floor unit located in a brown multifamily structure with address 244 Shelton Avenue New Haven,

Connecticut and is primarily accessed through the left clay colored door marked with black numerals "244"on a mailbox to the right of the door.  OGMAN is believed to currently reside at **SUBJECT PREMISES 2** with his mother, and, on several locations, investigators have observed OGMAN enter the multifamily dwelling in which **SUBJECT PREMISES 2** is located in after a controlled purchase. Therefore, based on my training and experience, and on the information set forth in this affidavit, I believe OGMAN stores the proceeds of his drug transactions at **SUBJECT PREMISES 2**.

c. "**TARGET TELEPHONE 1**" is an Apple iPhone utilizing phone number 678-306-9517, which, as described throughout this affidavit, OGMAN uses interchangeably to further his drug trafficking; and

d. "**TARGET TELEPHONE 2**" is an Apple iPhone utilizing phone number 475-318-2671, which, as described throughout this affidavit, OGMAN uses interchangeably to further his drug trafficking.

11.     Because the information and evidence gathered during this investigation is voluminous, I have not included each and every fact known to me concerning this investigation. Instead, I have set forth those facts which I believe are necessary to establish the existence of probable cause to support the requested warrants.

## II.      TRAINING AND EXPERIENCE

12.     As indicated above, I have been a law enforcement officer for over 6 years, over a year of which has been spent serving as a Special Agent in the DEA.

5

13.     During the course of my career in law enforcement, I have participated in numerous criminal investigations, including investigations involving suspected narcotics trafficking by individuals and organizations, gang activity, violent crime, and money laundering.

14.     My participation in these investigations has included debriefing cooperating sources and drug distributors, as well as other local, state and federal law enforcement officers, regarding the manner and means employed by narcotics traffickers, including the manner in which narcotics traffickers obtain, store, manufacture, transport, package and distribute their illegal drugs, finance their distribution operations, and conceal, transport, and launder the corresponding drug proceeds.

15.     I have coordinated controlled purchases of controlled substances utilizing confidential sources and undercover law enforcement agents and officers.  I have been the affiant on applications for federal search and seizure warrants, the execution of which resulted in the seizure of controlled substances.  I have been the affiant on applications for criminal complaints, the execution of which resulted in the arrest of persons engaged in unlawful activity.  I have executed, and coordinated the execution of, numerous search and seizure and arrest warrants.  I have conducted and coordinated electronic and physical surveillance of individuals involved in the illegal distribution of controlled substances.  I have analyzed records documenting the illegal purchase of and sale of controlled substances.  I have testified in federal grand jury proceedings and in a federal trial which contributed to the conviction of a known drug trafficker and gang member.

16.     Based upon my training and experience, I am familiar with the practices employed by narcotics traffickers to secrete their drugs, drug proceeds, and records relating to drug trafficking in an effort to avoid detection.  I know that drug traffickers, particularly drug traffickers

who operate at a reasonably high level, often maintain and/or utilize multiple premises, each with a specific purpose, to facilitate their drug trafficking organization's operational interests as well as to protect their interests from their competition and elude law enforcement.

17.     I know that drug traffickers, particularly those who distribute a high volume of drugs and those who distribute drugs on a daily basis or with frequency, often store cash drug proceeds and records relating to their drug trafficking and drug proceeds, including but not limited to records regarding the disposition, transportation, or transfer of drug proceeds, as well as records regarding drug debts or records pertaining to the identity of coconspirators, within their residences or other structures over which they can exercise complete dominion and control and which they can attempt to secure with surveillance cameras or other security measure.

18.     Search warrants relating to drug trafficking investigations have covered vehicles utilized by drug traffickers and their coconspirators, residences of drug traffickers and their coconspirators, premises and residences used by narcotics traffickers as "mills," where drugs are processed and packaged for re-distribution, "stash houses" used as storage locations for controlled substances, locations used as points of distribution for controlled substances, safe deposit boxes, and businesses and offices used by drug dealers as fronts to legitimize their unlawful drug trafficking. Materials searched for and/or recovered in these locations have included various controlled substances and residue of controlled substances; drug paraphernalia;  books and records reflecting drug sales, the transfer or transportation of drugs and amounts of monies owed for drugs; records reflecting the names, addresses, and telephone numbers of coconspirators; sales receipts, travel records and other records reflecting the expenditure of monies that are proceeds from unlawful drug distribution; currency and money wrappers; records of bank transactions made to conceal and launder drug trafficking proceeds; cellular telephones, computers and computer disks;

and various valuable assets that were purchased with the proceeds of unlawful drug trafficking. Items obtained by search warrants of this nature constituted evidence of drug violations and related offenses.

19.    Based on my training, experience, and participation in this and other drug trafficking investigations, I also know that:

      a.    drug traffickers commonly conceal within their residences, controlled substances, diluents, drug paraphernalia, including packaging and processing materials, cash proceeds and items of value derived from drug trafficking, wireless telephones used in furtherance of drug trafficking, firearms, financial records and documents relating to the distribution of controlled substances, including ledgers, and records and documents concerning transactions relating to transferring, storing, secreting, and spending money derived from drug trafficking, including receipts;

      b.    drug traffickers often place assets in names other than their own to avoid detection of these assets by law enforcement;

      c.    drug traffickers often place assets in the names of businesses and corporate entities as nominee title holders in order to avoid detection of these assets by law enforcement;

      d.    even though these assets are placed in the names of other persons or entities, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

e.     drug traffickers must maintain and have quick access to large amounts of United States currency, foreign currency, or other liquid assets in order to maintain and finance their ongoing drug businesses;

f.     drug traffickers maintain in their residences computerized or written books, records, receipts, diaries, ledgers, calendars, personal telephone/address books, airline tickets, airline schedules and airline receipts, cashiers' checks, money orders, telephones with memory capabilities, telephone answering machines and telephone answering tapes, and other papers relating to the transportation, ordering, sale and distribution, of controlled substances and the outstanding debts and collections from controlled substances that have been distributed;

g.     drug traffickers commonly provide narcotics on consignment to their customers, who subsequently pay for the drugs after reselling the drugs. Therefore, the above-mentioned books, records, receipts, notes, ledgers, et cetera, will be secured by the drug traffickers within their residences for their ready access to them for the purpose of determining drug debts and collecting monies derived from the sale of drugs;

h.     drug traffickers commonly conceal contraband, proceeds of drug transactions, records of these transactions, and records reflecting names, nicknames, addresses and telephone numbers of current and past drug associates within their residences;

i.     drug traffickers commonly use their homes to store records and/or receipts reflecting the collection of drug debts and the distribution of controlled

substances, as well as records and receipts reflecting the expenditure of drug proceeds for personal and business assets;

j.      drug traffickers will attempt to legitimize the profits from illegal drug transactions by using domestic banks and their attendant services such as safe deposit boxes, securities, cashiers' checks, money drafts, letters of credit, brokerage houses, real estate and business fronts;

k.      persons involved in drug trafficking who are aware of a criminal investigation into their financial drug activities, will conceal, liquidate, and transfer easily movable drug derived assets in order to prevent law enforcement agencies from seizing and forfeiting their assets;

l.      drug traffickers often have photographs, slides, or videos of themselves, their co-conspirators and the property and assets purchased with drug proceeds. These photographs and videos are normally in the drug trafficker's possession or residence, and are often stored on a cellular telephone;

m.      The State of Connecticut is generally viewed as a consumer state in regard to narcotic activity.   It is common for drug traffickers to travel to major distribution centers such as New York, Massachusetts, or Florida to purchase their narcotics for distribution.  It is known that after purchasing these narcotics, drug traffickers will transport these narcotics or cause them to be transported to those areas in which they will be distributed to their customers.   Drug traffickers' methods include, but are not limited to, the use of shipping companies, such as UPS or FedEx, commercial airlines, private motor vehicles, tractor trailer units, public transportation, motor vehicles with concealed

compartments, and government and contract mail carriers.  The residences of drug traffickers often contain records of drug related travel or shipping records. These records may include shipping receipts, airline ticket receipts, credit card receipts, rental car receipts and luggage tags reflecting points of travel;

n.   drug traffickers commonly have firearms and other weapons in their possession, in their cars, on their person, at their residence including, but not limited to, handguns, rifles, shotguns, automatic weapons, and knives.  These firearms and weapons are most often kept to protect and secure drug traffickers' drugs, drug proceeds, and property;

o.   it is a common practice for drug traffickers to store their drug proceeds, drug inventory, diluents, and drug related paraphernalia in their residences, including within safes or lock-boxes or other closed containers within their residences, or their cars, and it is also common for drug trafficker to store these items in the residences or cars of their trusted associates or "stash houses," owned or rented in a name other than their own; and,

p.   when controlled substances, including but not limited to cocaine, methamphetamine, and fentanyl are stored within a premises or an automobile, residue of the controlled substance can remain in the storage location for months after the drugs themselves have been removed, and there exists a process pursuant to which investigators can collect as evidence residue of suspected controlled substances, and the residue can be laboratory tested to confirm, or rule out, the presence of a controlled substance in the residue;

q.     drug traffickers often have, possess, maintain and control the items listed in the Attachments to the search warrants sought in this affidavit, in their homes, garages, out-buildings, cars, and other premises to which they have access and/or over which they can exercise dominion and control;

r.     gangs are often associated with particular colors, and in the case the Grape Street Crips, gang members wear purple, and wear clothing and have items such as beads, with that color. Leaders also often maintain books, records and correspondence including rosters, documentation of dues, and charters/bylaws in their residences or other locations they control.

20.     I am also familiar with the manner and means by which narcotics traffickers communicate, as well as the devices commonly utilized by them, and those methods employed by narcotics traffickers in an effort to avoid detection by law enforcement.

21.     I know that narcotics traffickers often use cellular telephones, and often speak to one another using coded, cryptic or slang words and phrases, in the belief that, by doing so, they can thwart the efforts of law enforcement to identify them and their activities and to seize their drugs and/or assets.

22.     I am familiar with the slang and coded conversation employed in the narcotics trade, and I know the wholesale and retail value and pricing associated with various controlled substances, including heroin, cocaine, cocaine base, oxycodone, and marijuana, and the manner in which these controlled substances are commonly packaged for wholesale and retail, i.e. "street-level," distribution.

23.     I know that drug traffickers frequently have access to several cellular telephones, and that they periodically use newly acquired cellular telephones and sometimes re-activate a

cellular telephone that has not been used for a period of time.  I also know that narcotics traffickers sometimes use cellular telephones subscribed to by other persons and pre-paid cellular telephones that require the purchaser to provide little or no identifying information to purchase, activate and utilize, which is done in an effort to avoid detection and thwart the efforts of law enforcement. I also know that persons generally keep their cellular telephones on their persons or in relatively close proximity so as to allow easy access.

24.     Based on my training and experience, and consultation with, and information received from, other law enforcement sources, including sources with expertise pertaining to the features and functionality of cellular telephones and computers, I know the following information tends to exist on wireless telephones, including wireless telephones utilized by those engaged in narcotics trafficking activities:

   a.   the telephone call number and other identifiers (ESN number, IMSI, IMEI, MEID, and SIM card number) associated with said device/s;

   b.   call logs/histories, numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images and videos stored in the memory of said device/s;

   c.   descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, the above-described offenses;

   d.   records which tend to demonstrate ownership and use of the phone, and identification bearing the name or photograph of any person, telephone-books, address books, date books, calendars, personal files, and photographs of persons contained in the phone;

e.   information showing or tending to show the identity of the maker or user of the data and information contained in the phone, such as passwords, sign-on codes, and program design;

f.   GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;

g.   saved searches, locations, and route history in the memory of said device/s; and,

h.   internet browsing history, to include, internet searches in the memory of said device/s.

## **PROBABLE CAUSE**

## III.   **BACKGROUND OF THE INVESTIGATION**

25.     The DEA NHDO has conducted a long-term investigation of suspected drug trafficking in and around New Haven County, Connecticut, by Donald Charmaine OGMAN and his associates including members of the Grape Street Crips ("GSC") criminal enterprise.

26.     OGMAN has 15 arrests in the State of Connecticut, with the most recent being in 2013. In his 2013 arrest OGMAN was charged with threatening. OGMAN also has a previous federal conviction. OGMAN was arrested in the District of Connecticut in 2012 by the Federal Bureau of Investigation (FBI) for conspiracy and possession of cocaine. The FBI investigation revealed that OGMAN was the leader of the GSC, with which OGMAN was engaged in acts of violence along with drug trafficking.  In 2015, OGMAN was sentenced by the Honorable Warren W. Eginton to 188 months in federal prison. for conspiracy to possess with intent to distribute 280 grams or more of crack cocaine, in violation of 21 U.S.C. §§ 846, and 841(a)(1) and (b)(1)(A)

(No. 3:12CR74 (SRU)). In the Fall of 2022, OGMAN's motion for compassionate release was granted and he was released. OGMAN is currently on federal supervised release.[1]

27.     As set forth below, OGMAN is believed to be one of the leaders of GSC, a multi-drug drug trafficking organization based in New Haven, Connecticut.  Although confidential sources have provided intelligence that OGMAN is distributing narcotics with other members of the GSC, to date, investigators have been unable to identify who is supplying OGMAN with cocaine or which members of the GSC meet with OGMAN directly.

28.     Over many years, OGMAN has become known to the DEA as one of the most violent drug dealers operating within the city of New Haven. He has been the subject of multiple drug investigations dating back to at least 1997. More recently, after being released from prison, OGMAN regained a leadership position within the GSC. Investigators were provided with information from the State of Connecticut Department of Corrections (CTDOC) and Federal Bureau of Prisons (BOP) which detailed OGMAN's activities while OGMAN was incarcerated. DOC personnel noted that OGMAN openly recruited other inmates and continued to display a leadership position while incarcerated. Finally, DOC personnel noted that after OGMAN was transferred to federal custody, OGMAN's name continued to be respected and surfaced in phone conversations. Investigators have reviewed some of this intelligence from the DOC and have found that it corroborates the DOC reporting. The jail writings detail the "Top in CT" which is believed

---

[1] Notably, one of OGMAN's conditions of supervised release includes a condition that: "The defendant shall submit his person, residence, office or vehicle to a search, conducted by a United State Probation Officer at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a violation of a condition of release; failure to submit to a search may be grounds for revocation; the defendant shall warn any other residents that the premises may be subject to searches pursuant to this condition."

to be a hierarchy of the gang members in Connecticut. The writing lists "Boss Player" as "Mainey-O" which is thought to be a direct reference to OGMAN and his street name.

29.     Investigators also know that members of the GSC in New Haven, Connecticut have been responsible for countless acts of violence in the greater New Haven Area. Since 2008, law enforcement have catalogued countless acts which have some connection to the GSC. These acts include robberies, homicides, and assaults, among others.

30.     Following his release in Fall 2022, investigators became aware that OGMAN was continuing to engage in criminal activity and re-opened an investigation into OGMAN.  The current investigation employed various investigative techniques, including but not limited to, controlled purchases of drugs from OGMAN, the examination of records, including but not limited to financial records, call detail records, motor vehicle records and/or utility records, the gathering of precise location information utilizing phone pings, the use of pole cameras, trash pulls, and physical surveillance.

31.     The investigation has established that OGMAN is continuing to engage in the **Target Offenses**, including by distributing cocaine base/crack cocaine, and vibrantly counterfeited multicolored pills laced with methamphetamine which are pressed into shapes that are found in pop culture. These shapes include but are not limited to "Angry Birds," "Mercedes symbols," "Peppa Pig," and numerous other designs and shapes.

32.     As described herein, OGMAN's suspected stash location/ distribution area is **SUBJECT PREMISES 1**, located at 429 Shelton Avenue 2nd floor, New Haven, Connecticut.

33.     OGMAN resides at **SUBJECT PREMISES 2**, located at 244 Shelton Avenue, New Haven, Connecticut and is suspected of storing drug proceeds within.

34.     OGMAN utilizes **TARGET TELEPHONE 1** and **TARGET TELEPHONE 2** interchangeably to facilitate his drug trafficking operation. Additionally, OGMAN has access to multiple types of controlled substances, such as methamphetamine and cocaine base.

35.     Cooperating Source (CS) communications between OGMAN and the CS have found that OGMAN is reluctant to discuss narcotics specific narcotics transactions via iMessage. OGMAN and the CS's mainly coordinate their transactions via FaceTime. OGMAN has told a CS "FaceTime is encrypted" during  a controlled purchase.

## V.     COOPERATING AND CONFIDENTIAL SOURCES

36.     The term "cooperating source" ("CS") is used herein to described three discrete categories of individuals:  Cooperating Witnesses, Confidential Informants, and Sources of Information.  Cooperating Witnesses are sources who have indicated a willingness to testify in court proceedings.  Confidential Informants are sources who are currently cooperating with law enforcement, or have done so in the past, but who have *not* agreed to testify.  Sources of Information are sources who are *not* necessarily cooperating with law enforcement, and who have *not* agreed to testify, but who have provided information to law enforcement, sometimes in the context of a post-arrest statement, and sometimes in other contexts.

37.     The DEA, to date, has obtained information regarding OGMAN from three cooperating sources in this investigation.  Unless otherwise stated, any information obtained from a Cooperating Source ("CS") in this case has been related to your affiant by the source, by members of the NHDO and/or by other law enforcement officers who have debriefed the source.  Moreover, unless otherwise stated, all source information set forth herein is based upon personal observations by the source and/or statements directed to or overheard by the source, from OGMAN, his criminal associates, or persons with personal knowledge of the incidents described herein.

17

38.     A description of, and background information about, the Cooperating Source debriefed in connection with this investigation is set forth below and is followed by a narrative summary of the information the CS provided to law enforcement.

**Cooperating Source 1**

39.     Cooperating Source 1 ("CS-1"), as indicate above, is a confidential informant who has not agreed to testify.  CS-1 has been an ATF CS since approximately November 2023.  CS-1 is cooperating with the ATF/DEA for monetary compensation.  Prior to cooperating with the ATF/DEA, CS-1 was a CS for the Hamden Police Department for approximately 1 year.   CS-1 has provided information and participated in investigations that have resulted in numerous arrests which are awaiting prosecution. Additionally, the CS has provided information regarding gun violence and gang/drug politics within the Newhalville neighborhood of New Haven.  Information provided to controlling agents by CS-1 regarding OGMAN has been corroborated, at least in part, through several controlled drug purchases and corresponding DEA surveillance. Additionally, as detailed more fully below, agents have directed CS-1 to place calls to OGMAN on numerous occasions for the purpose of obtaining drugs, have observed CS-1 participate in these controlled calls, and have listened to the content of these calls. CS-1 has been proven to be truthful, accurate and reliable. CS-1 has seventeen prior arrests in the state of Connecticut, the most recent being in 2018. These charges include larceny, assault, forgery, firearms charges, narcotics charges, and interfering/resisting.

40.     Information provided to controlling agents by CS-1 regarding OGMAN, and the drug trafficking organization with which he is believed to be associated, has been corroborated, at least in part, through several controlled drug purchases by CS-1 from OGMAN and corresponding DEA surveillance.  Additionally, agents directed CS-1 to place calls and texts to OGMAN on

numerous occasions for the purpose of obtaining drugs, have observed CS-1 participate in these controlled calls and texts and have listened and seen the  content of these calls/texts.

**Cooperating Source 2**

41.     Cooperating Source 2 ("CS-2") as indicated above, is a Cooperating Witness who has agreed to testify. CS-2 has been an ATF CS since approximately December 2023. Prior CS-2's official status as a confidential informant CS-2 was a source of information who provided information regarding the structure and inner workings of the GSC, a gang that OGMAN is associated with. To date, CS-2 has not been utilized to conduct controlled purchases. However, CS-2 provided information regarding one of OGMAN's possible stash location, **SUBJECT PREMISES 1** (also known as "the fortress"). CS-2 explained that "the fortress" is a multi-family residence which is used by numerous drug dealers to distribute narcotics to their customers.  CS-2's information has been corroborated, in part during controlled purchases by CS-1 that have taken place from **SUBJECT PREMISES 1**. CS-2 has been proven to be truthful, accurate and reliable. CS-2 has sixteen prior arrests in the state of Connecticut, the most recent being in 2023.  The charges include narcotics offenses, firearms offenses, assaults, motor vehicle offenses, probation violations, and threatening/harassment charges.

**Cooperating Source 3**

42.     Cooperating Source 3 ("CS-3"), as indicate above, is a cooperating witness who has agreed to testify.  CS-3 has been a long-term ATF CS.  CS-3 is cooperating with the ATF/DEA for monetary compensation.   Prior to cooperating with the ATF/DEA, CS-3 has provided information and participated in investigations that have resulted in numerous arrests.  Additionally, CS-3 has conducted numerous controlled purchases over the course of this investigation. Information provided to controlling agents by CS-3 regarding OGMAN has been corroborated, at

19

least in part, through several controlled drug purchases and corresponding DEA surveillance. Additionally, as detailed more fully below, agents have directed CS-3 to make FaceTime calls and texts to OGMAN on numerous occasions for the purpose of obtaining drugs. Investigators have listened to CS-3 participate in these controlled calls and have listened to and reviewed the content of these calls and text messages. CS-3 has been proven to be truthful, accurate and reliable.  CS-3 has eight prior arrests between Connecticut and New York the most recent being in 2008. The charges include narcotics offenses, assault, burglary, trespassing, threatening, motor vehicle charges, and a firearms charge.

## VII.   CONTROLLED DRUG PURCHASES

### <u>CONTROLLED PURCHASE #1</u>

43.     On or about November 8, 2023, members of the DEA Task Force utilized CS-1, to purchase a quantity of crack from OGMAN by utilizing $300.00 in DEA Official Advanced Funds (OAF).

44.     At approximately 11:51 A.M.,  investigators  met with the CS-1 at a pre-determined location to discuss the details of the controlled buy. TFO Lipford searched CS-1 for contraband and excess currency which netted negative results. Plans were then formulated for the CS-1 to place an outgoing phone call to OGMAN to arrange a meeting to purchase crack. Following this briefing, CS-1 was provided $300.00 in DEA OAF and outfitted with a recording and transmitting device. At approximately 11:55 A.M., law enforcement and CS-1 departed the pre-determined location and proceeded to a secondary location. At approximately 12:05 P.M., surveillance was established in vicinity of Shelton Avenue, New Haven, CT.

45.     At approximately 12:17 P.M., CS-1 departed the secondary staging area and placed an outgoing phone call to **TARGET TELEPHONE 1**.  While monitoring a listening device, SA

Brouillard and TFO Lipford heard CS-1 speaking to an individual on the phone, later confirmed to be OGMAN. CS-1 could be heard agreeing to meet at "PK."( Investigators have learned that this is code for the area of J.B. Liquors at 432 Shelton Avenue, New Haven).  Investigators maintained a visual of CS-1 as CS-1 traveled to the meet location through mobile and static surveillance.

46.     At approximately 12:30 P.M., SA Kyle Van Almkerk observed CS-1 arrive at J.B. liquors. CS-1 briefly stopped at the liquor store before continuing across the street to a multi-family residence in which **SUBJECT PREMISES 1** is located. Upon arrival to the residence, CS-1 was observed speaking with two black males—one of whom CS-1 later confirmed was OGMAN—that were already present on the porch.  Moments later, SA Van Almkerk observed CS-1 and OGMAN enter the residence. It should be noted that CS-1 entered the left door of the residence, later identified as the access point to **SUBJECT PREMISES 1**.

47.     At approximately 12:36 P.M., SA Van Almkerk observed CS-1 exit **SUBJECT PREMISES 1** and walk across the street to the area of the liquor store. At approximately 12:41 P.M., SA Van Almkerk observed CS-1 return to the porch of **SUBJECT PREMISES 1** and briefly converse with two black males (one of whom was later  confirmed to be OGMAN). Moments later CS-1 departed the area. Surveillance was maintained on CS-1 until his/her arrival back to the pre-determined area to meet with investigators.

48.     At the pre-determined meeting point, investigators conducted a debrief of CS-1. During the debrief CS-1 stated, in substance, that  upon arrival to **SUBJECT PREMISES 1,** CS-1 walked up the steps to the porch and greeted OGMAN and another unidentified black male. CS-1 believed that the unidentified black male was likely a look-out or at the residence to cook crack. CS-1 stated that CS-1 and OGMAN then stepped inside the left door of the residence to discuss

prices for crack.  CS-1 stated that the two agreed to $300 for approximately 7.5 grams of cocaine base. CS-1 stated that after the exchange CS-1 departed the residence and walked across the street to the liquor store. However, moments later, OGMAN called CS-1 back to the porch of **SUBJECT PREMISES 1.** CS-1 returned to the porch and had a brief conversation with OGMAN. CS-1 stated that OGMAN offered CS-1 "paper," which I know to be the street name for heroin and/or fentanyl, and began discussing prices for bundle quantities. CS-1 declined OGMAN's offer.

49.     During the debrief, CS-1 handed investigators three (3) clear plastic baggies containing a white rock-like substance obtained from OGMAN.  Following this transfer, TFO Lipford searched CS-1 for contraband and excess currency, which netted negative results. The rock-like substance was field tested and came back positive as cocaine base.  DEA lab testing is still pending.

### CONTROLLED PURCHASE #2

50.     On March 4, 2024, members of the Task Force utilized CS-3, to purchase a quantity of methamphetamine pills from Donald OGMAN by utilizing $500.00 in DEA OAF.

51.     At approximately 1:30 P.M., SA Chris Rettig and SA Alex MacNamara met with CS-3 at a pre-determined location to discuss the details of the controlled buy.  Following this meeting, investigators searched CS-3 and the ATF Special Purpose Vehicle ("SPV") being utilized for the operation for contraband and excess currency, which netted negative results. It should be noted that the SPV is a vehicle that is equipped with audio and video recording equipment, which was activated during this controlled purchase. Additionally, CS-3 was equipped with a separate audio transmitter/recorder that can be listened to in real time as well as capturing the audio recording as evidence.

52.     At approximately 2:15 P.M., surveillance was established in the vicinity of Shelton Avenue, New Haven, CT. Shortly thereafter, CS-3 departed in the ATF SPV. Surveillance was maintained on CS-3 for the duration of the operation.

53.     At approximately 2:26 P.M., SA Matthew Brouillard, while monitoring a listening device, heard CS-3 speaking with a male voice on the phone. CS-3 later confirmed that he was communicating with OGMAN via **TARGET TELEPHONE 2** for the duration of this call. CS-3 and OGMAN agreed to meet at Ashe's Barbershop (336 Shelton Avenue, New Haven) in the vicinity of Shelton Avenue and Bassett Street.

54.     At approximately 2:28 P.M., TFO Ray Torres observed CS-3's vehicle arrive in the vicinity of Ashe's Barbershop. Upon arrival, OGMAN was already present at the barbershop and entered the passenger door of CS-3's vehicle. CS-3's vehicle then departed south on Shelton Avenue before stopping and parking in the vicinity of Shelton Avenue and Brewster Street. At approximately 2:30 P.M., SA Rettig observed OGMAN exit the passenger door of CS-3's vehicle and walk south on Shelton Avenue while CS-3's vehicle departed the area. Surveillance was maintained on CS-3's vehicle.

55.     At 2:31 P.M., TFO Torres observed OGMAN continue to walk south on the western side of Shelton Avenue in the vicinity of the Lincoln-Bassett Community School. TFO Torres lost sight of OGMAN as he continued walking south on Shelton Avenue. Security camera footage from the Lincoln-Bassett Community School at 2:31 P.M. revealed an individual wearing a dark colored hoodie, matching the description of OGMAN, walk south on the western side of Shelton Avenue and enter the front of **SUBJECT PREMISES 2**. It should be noted that OGMAN was observed wearing a dark colored hoodie during the narcotics transaction with CS-3.

56.     At approximately 2:45 P.M., CS-3 met investigators at a pre-determined location for a debriefing. CS-3 stated, in substance, that he and OGMAN agreed to meet at Ashe's Barbershop. Once CS-3 arrived, OGMAN quickly approached the vehicle on foot and entered the front passenger side.  Once in the vehicle, OGMAN handed CS-3 a quantity of pills with a small baggie.  OGMAN stated he may have provided CS-3 with 12 additional pills.  OGMAN stated he expected additional money during the next transaction for these supplemental pills.  It is noted that OGMAN provided only one additional pill to CS-3.  During the meeting, OGMAN disclosed to CS-3 that he obtains these pills for approximately $3.60 per pill.  The transaction on this date was $5.00 per pill per a prior agreement between the two parties.  OGMAN stated he would lower the price per pill if CS-3 doubled the quantity requested.  CS-3 also noted that during the FaceTime call to OGMAN on **TARGET TELEPHONE 2**, OGMAN was not wearing a face mask, but was partially masked up during the controlled purchase in CS-3's vehicle.  Once the parties were within CS-3's vehicle, CS-3 drove away from the meet location with OGMAN.  Ultimately, CS-3 dropped off OGMAN in the vicinity of Shelton Avenue and Ivy Street in the city of New Haven.

57.     During the debrief, CS-3 handed over to SA MacNamara one (1) clear plastic baggie containing a quantity of pills of several shapes and colors. Investigators searched CS-3 and the ATF SPV for contraband and excess currency, which netted negative results. SA MacNamara and SA Lugo then transported the exhibit to the DEA NHDO where the exhibit was processed by SA MacNamara. The pills were submitted to the DEA Northeast Laboratory for analysis. Lab testing confirmed that the 101 pills weighed 39.886 grams and contained a mixture of methamphetamine and caffeine.

## CONTROLLED PURCHASE #3

58. During the week ending on March 16, 2024, members of the DEA Task Force in conjunction with the ATF formulated plans to utilize CS-3 to purchase narcotics from OGMAN.

59. At approximately 12:46 A.M., OGMAN texted CS-3 from **TARGET TELEPHONE 1**, "Yoooo I'm not over there West Haven."  CS-3 responded, "Ok running I motherfuckers made me clean the truck and fuel three truck. I'll be there about two 230 to shoot me the address I'll be there I got you I promise you know my word my bond."  OGMAN responded from **TARGET TELEPHONE 1**,"Ok I got a dentist appointment at 3pm so but that's going to be fast." CS-3 responded, "Ok got you i'll be there way before three so you'll have time to get you a dentist appointment. I promise to shoot me the address where I gotta be." OGMAN responded again, "Ok as soon you get closer hit me I mite be anywhere."

60. At approximately 1:30 P.M., law enforcement met with CS-3 at a pre-determined location. At approximately 1:40 P.M., SA Lugo provided CS-3 with $1,000.00 of DEA OAF and outfitted CS-3 with a recording device.

61. At approximately 1:49 P.M., OGMAN texted CS-3 from **TARGET TELEPHONE 1,** "You close?"  At approximately 1:58 P.M., investigators searched  CS-3 and his vehicle, and no contraband or weapons were located. At approximately 2:02 P.M., ATF SA Rettig activated electronic and audio surveillance in the SPV and in a separate transmitter/recording device. Additionally, CS-3 was equipped with a separate audio transmitter/recorder that can be listened to in real time as well as capturing the audio recording as evidence.

62. At approximately 2:05 P.M., CS-3 headed to a second pre-determined location to place a phone call to OGMAN. During the drive from the primary meet location to secondary meet location, CS-3 was under constant surveillance. At approximately 2:14 P.M., CS-3 called

**TARGET TELEPHONE 2** as witnessed by SA MacNamara. OGMAN answered the phone, and a female voice could be heard in the background. OGMAN said, "Yo." CS-3 responded, "Yo," OGMAN immediately responded, "FaceTime." CS-3 stated, "My fault my fault I'm trying to this shit's not letting me answer it." OGMAN responded, " Wait Wait Wait Imma call you." OGMAN proceeded to FaceTime CS-3 multiple times, but CS-3 did not answer the FaceTime calls and attempted to call OGMAN back via cellular phone. However, OGMAN immediately sent the phone calls to voicemail. While CS-3 and OGMAN were attempting to speak with each other, they exchanged several text messages. OGMAN texted from **TARGET TELEPHONE 2**, "Turn off your Bluetooth." CS-2 responded, "Did it's not working as soon as I call it hangs up"  OGMAN texted, "Ok just answer my phone" and CS-3 responded, "Yes boost." OGMAN texted again, "Picc up the phone" and CS-3 responded, "Let me move No bars." OGMAN texted "Idk." CS-3 texted back, "Hold on moving from under Q bridge." OGMAN responded, "Cuz no more text."  All of the texts occurred between CS-3 and OGMAN using the **TARGET TELEPHONE 2** and were reviewed by agents.

63.     At approximately 2:22 P.M., CS-3 began driving towards the area of Dixwell Avenue, where the prior transactions had been conducted, while under surveillance by investigators. At approximately 2:25 P.M., CS-3 placed a FaceTime call to **TARGET TELEPHONE 2**, which OGMAN directed him to the Burger King in Hamden (937 Dixwell Avenue, Hamden, CT). At approximately 2:38 P.M., GS Raymond McGrath observed CS-3 enter the Burger King parking lot. At approximately 2:39 P.M., IRS SA Dustin Johnson observed a black male wearing camouflage pants and a black jacket—later confirmed by CS-3 to be OGMAN—walk up to CS-3's vehicle and enter the front passenger door. At approximately 2:41

P.M., IRS SA Dustin Johnson observed OGMAN exit CS-3's vehicle and walk between two brick buildings north of Burger King.

64.     At approximately 2:54 P.M., law enforcement met with CS-3 at a pre-determined location for a debriefing.  During the debrief, CS-3 stated, in substance, that upon arrival at the Burger King parking lot, OGMAN approached CS-3's vehicle and entered the front passenger side.  The two parties discussed the phone issues CS-3 was experiencing which led to the traditional cellular call to OGMAN's phone before turning to the narcotics transaction. In the vehicle, OGMAN removed the quantity of pills from his front left cargo pants pocket.  The pills were contained within three small plastic twist baggies.  CS-3 provided OGMAN $1,000 in exchange for the pills.  It should be noted that OGMAN did not count the money provided by CS-3. Additionally, OGMAN informed CS-3 he believed he provided CS-3 with more than the agreed upon 280 pills.

65.     CS-3 gave SA MacNamara three knotted clear plastic bags containing numerous multicolored pills which field tested positive for methamphetamine and fentanyl. Following this transfer, investigators searched CS-3  the SPV for contraband and excess currency. These searches netted negative results. The pills were submitted to the DEA Northeast Laboratory for analysis. Lab testing confirmed that the 255 pills collectively weighed 86.83 grams and contained a mixture of methamphetamine and caffeine.

**CONTROLLED PURCHASE #4**

66.     During the time period of March 17 to March 24, 2024, at the direction of ATF agents, CS-3 contacted OGMAN to arrange a future controlled narcotics purchase on March 25,

2024. The day prior, on March 24, 2024, OGMAN texted CS-3 from **TARGET TELEPHONE 1,** "What time tomorrow you think big bro?"  CS-3 responded, "Around two".

67.     On March 25, 2024, at approximately 10:54 AM, OGMAN texted CS-3 from **TARGET TELEPHONE 2**, "2pm?" and CS-3 responded with a thumbs up emoji. At approximately 1:30 PM, law enforcement met with CS-3 at a pre-determined location, where investigators searched CS-3 and the ATF SPV for any contraband and/or unaccounted for monies, which yielded negative results.  At approximately 1:45 PM, ATF SA Patruno provided CS-3 with $1,300.00 in ATF Agent Cashier Funds ("ATF Funds") for the controlled purchase and outfitted him with a recording device. At approximately 2:02 PM, ATF SA Rettig activated the ATF electronic surveillance in the SPV and in a seperate transmitter/recording device. Additionally, CS-3 was equipped with a separate audio transmitter/recorder that can be listened to in real time as well as capturing the audio recording as evidence.

68.     At approximately 2:11 PM, CS-3 conducted a FaceTime call to **TARGET TELEPHONE 1**.  During the conversation, OGMAN told CS-3 to meet on Stevens Street in New Haven Law enforcement surveillance units established positions in in the area of  Stevens Street. At approximately 2:25 PM, OGMAN made a FaceTime call to CS-3 from **TARGET TELEPHONE 2** in which CS-3 told OGMAN that CS-3 was two minutes from Stevens Street.

69.     At approximately 2:29 PM, CS-3 arrived and parked near the intersection of Stevens Street and Sylvan Avenue in New Haven.  A short time later, at approximately 2:31 PM, CS-3 attempted a FaceTime call with OGMAN to **TARGET TELEPHONE 1**.  At approximately 2:35 PM, OGMAN texted CS-3 from **TARGET TELEPHONE 2** stating, "2 minutes."  Several minutes later, at approximately 2:44 PM, CS-3 texted OGMAN "?"  OGMAN responded, "Around the corner" and CS-3 responded, "Bout to be out."  At approximately 2:50 PM, OGMAN then

texted CS-3, "I was at Walgreens with wife I ain't her to know my business." OGMAN then FaceTimed CS-3 from **TARGET TELEPHONE 2** and told CS-3 to come to Walgreens (located at 88 York St, New Haven, CT 06511).

70.     At approximately 2:58 PM, while under surveillance, CS-3 arrived at the Walgreens in the SPV and parked next to a two-door dark colored Honda, associated with OGMAN. Investigators observed OGMAN enter CS-3's vehicle through the front passenger door and sit briefly before exiting CS-3's vehicle and getting back into the dark colored Honda. At approximately 3:00 PM, CS-3 departed Walgreens parking lot and followed law enforcement back to the pre-determined meet location.

71.     At approximately 3:04 PM, CS-3 arrived back at the pre-determined meet location for a debriefing. During the debrief, CS-3 stated that he met OGMAN at Walgreens, where OGMAN entered his car, reached into his front sweatshirt pocket and retrieved a bag containing pills which he placed into the center cupholder.  In return, CS-3 provided OGMAN with $1,300 in ATF funds. At approximately 3:06 PM, ATF SA Rettig terminated the audio/video electronic surveillance.

72.     During the debrief, CS-3 provided investigators with the purchased bag of pills. Investigators searched CS-3 and the SPV for any additional contraband or unaccounted for monies, which yielded negative results The pills were taken into law enforcement custody by ATF SA Rettig and shipped to the DEA Northeast Laboratory for analysis. Lab testing confirmed that the 323 pills weighed 114.92 grams and contained a mixture of methamphetamine and caffeine.

## CONTROLLED PURCHASE #5

73.     On April 21, 2024, at the direction of investigators, CS-3 contacted OGMAN to arrange a controlled purchase of methamphetamine pills on April 23, 2024. CS-3 sent a text

message to **TARGET TELEPHONE 1** that stated, "Back tomorrow look for Tuesday 13." OGMAN responded, "Bet!!!"

74.     On April 23, 2024, members of the DEA Task Force utilized CS-3 to purchase a quantity of methamphetamine pills from Donald OGMAN by utilizing $1,300.00 in DEA OAF. At approximately 1:00 P.M., CS-3 sent a text to **TARGET TELEPHONE 1** which stated, "On my way!" OGMAN responded, "Ok" and "How long?" OGMAN asked CS-3 if he wanted more than the previously agreed upon quantity of pills, stating , "U staying with the 13?" OGMAN then said, "Or lil more," referring to OGMAN having more than $1,300.00 of pills. CS-3 responded, "Yea," meaning that he was sticking with the previously discussed amount.

75.     At approximately 1:20 P.M., surveillance was established in the vicinity of Shelton Avenue and Bassett Street, New Haven, CT.

76.     At approximately 1:30 P.M., SAs Alex MacNamara, Matthew Brouillard, and Chris Rettig met with CS-3 at a pre-determined location to discuss the details of controlled buy. CS-3 was provided with $1300.00 in DEA OAF.  SAs Rettig and Sam Fuller searched CS-3 and the ATF SPV for contraband and excess currency, which netted negative results. Shortly thereafter, ATF electronic surveillance in the SPV and in a separate transmitter/recording device was activated.  Additionally, CS-3 was equipped with a separate audio transmitter/recorder that can be listened to in real time as well as capturing the audio recording as evidence.

77.     At approximately 2:20 P.M., CS-3 departed the neutral location in the SPV. Surveillance was maintained on CS-3 for the duration of the operation. At approximately 2:35 P.M., TFO Joe Harrington observed CS-3's vehicle arrive at Ashe's Barbershop, located at 336 Shelton Avenue. Shortly after his arrival, SA Matthew Brouillard, while monitoring a listening device, heard CS-3 speaking with a male voice on the phone (whom CS-3 later confirmed was

OGMAN). Later analysis by investigators found that CS-3 placed a FaceTime call to **TARGET TELEPHONE 1** upon CS-3's arrival in the area.  CS-3 confirmed his/her arrival at the meet location with OGMAN on the FaceTime Call.

78.     At approximately 2:40 P.M., aerial surveillance observed a black male—who CS-3 later identified as OGMAN--enter the passenger door of CS-3's vehicle. Shortly thereafter, OGMAN exited CS-3's vehicle and entered the passenger door of a silver BMW that was already present in the barbershop parking lot. CS-3 then departed the area. At approximately 2:42 P.M., TFO Harrington observed the BMW depart the barbershop parking lot and park in the vicinity of **SUBJECT PREMISES 2**. TFO Harrington then observed OGMAN exit the BMW and enter the right door of the 242-248 Shelton Avenue building (where **SUBJECT PREMISES 2** is located).[2]

79.     At approximately 2:45 P.M., aerial surveillance observed OGMAN exit one of the doors from the building  where **SUBJECT PREMISES 2** is located and return to the BMW and enter the passenger door. The BMW then departed south on Shelton Avenue. At approximately 2:56 P.M., aerial surveillance observed the BMW park on Elm Street in the vicinity of 195 Church Street. OGMAN then exited the passenger door of the BMW and walked out of field of view while the BMW departed the area. Surveillance was maintained on the BMW.  At approximately 3:12 P.M., aerial surveillance observed the BMW park in the vicinity of Sylvan Street and Asylum Street. At this time the driver exited the BMW, briefly entered a bodega on the corner, and then

---

[2] Based on electricity records from United Illuminating, the multi-family two-story dwelling located at 242-248 Shelton Avenue is a four-unit dwelling, with two units on each level. **SUBJECT PREMISES 2,** located at 244 Shelton Avenue, is a second floor unit, which appears to be accessible through the left-hand door between the numbers "242" and "244." Although this door appears to be the primary access point to the second floor apartment on the left side of the house, it is unclear if residents of the building are able to utilize both doors interchangeably to enter a common area to access all units.

returned to the BMW.  Moments later the BMW departed the area and parked in the vicinity of 178-180 Kimberly Avenue. The driver of the BMW was later identified as male associate 1 ("MA-1"), whose identity is known to investigators.

80.     At approximately 3:02 P.M., CS-3 arrived at a pre-determined location for a debrief.  CS-3 stated, in substance, that, as with the previous controlled purchase on April 12, 2024, the two parties agreed to meet at Ashe's Barbershop.  Once CS-3 arrived at the location, CS-3 placed a FaceTime call to **TARGET TELEPHONE 1** during which OGMAN stated that he was coming "right now." OGMAN appeared to be getting dressed during the FaceTime call.

81.     CS-3 explained that OGMAN approached the vehicle on foot and entered the front passenger side. Upon entering the vehicle, OGMAN stated he was going to "Mofongo" restaurant on Whitney Avenue, New Haven, CT.  OGMAN retrieved the pills from his vest pocket and placed them into the center cupholder of CS-3's vehicle. OGMAN then exited the CS-3's vehicle and walked towards a silver two door BMW sedan. OGMAN entered the passenger's seat of the silver BMW. The operator of the silver BMW was a black male wearing jeans and a white t-shirt with braids in his hair. CS-3 informed investigators that the operator of the silver BMW was looking around possibly conducting countersurveillance prior to OGMAN arriving in the area.

82.     During the debrief, CS-3 provided TFO Reilly with four (4) clear plastic baggies containing a quantity of pills of several shapes and colors. Investigators searched CS-3 and the ATF SPV for contraband and excess currency, which netted negative results. On the same day, SAs Brouillard and MacNamara retrieved the exhibit from the ATF New Haven Office and transported the exhibit to the DEA NHDO. The exhibit was then field tested and tested positive for presence of methamphetamine. The exhibit was submitted to the DEA lab and confirmatory lab testing is still pending.

**VI**.     **ADDITIONAL INFORMATION REGARDING THE SUBJECT PREMISES**

83.     Pertinent facts and communications pertaining to the **SUBJECT PREMISES** and/or OGMAN have been set forth in the preceding sections of this affidavit.   Additional information relating to the **SUBJECT PREMISES** for which search warrants are sought is set forth below.   The summaries of surveillance operations set forth below often include interpretive belief statements from your affiant, which is based upon the training, experience, and knowledge of the affiant and agents working on this case, including knowledge gained through this investigation.

**Additional Information Pertaining to SUBJECT PREMISES 1**

84.     **SUBJECT PREMISES 1** is the second floor located at 429 Shelton Avenue, New Haven, CT, accessed through a door on the left side of the residence, when viewing the residence from the street, marked "429."   As explained below, the entrance marked "429" leads to two stairwells feeding to the second and third floor interior dwellings, however, based on my knowledge of the investigation and confidential sources of information, I believe that OGMAN is utilizing the second floor as a stash location for his narcotics.

85.     Based upon on my training, experience, the totality of this investigation and my knowledge of it, along with coordinated surveillance and controlled purchases, I believe a) that **SUBJECT PREMISES 1** is a stash/ distribution area for OGMAN primary residence; and b) that evidence of drug trafficking offenses, including but not limited to controlled substances, residue of controlled substances, as well as drug packaging material and paraphernalia are located within **SUBJECT PREMISES 1**. The totality of the investigation described in this affidavit establishes

probable cause to believe that Donald OGMAN distributes narcotics, including methamphetamine and cocaine base.

86.     This conclusion is supported, in part, by the events of April 23, 2024 and recent information provided by CS-1.

87.     On April 23, 2024, investigators conducted a trash pull operation at **SUBJECT PREMISES 1**. The trash pull located a plastic sandwich bag which had a white powder residue inside. Subsequent field testing revealed that the white powder residue tested positive for cocaine. The residue was submitted to the DEA lab and confirmatory lab testing is still pending.

88.     Additionally, on or about the date of April 25, 2024, CS-1 provided additional information to investigators regarding the narcotics and firearms activity in the Northmost portion of the Newhallville region. CS-1 stated that there is an adult male individual employed by OGMAN to sell crack cocaine from a multifamily residence located at **SUBJECT PREMISES 1**. CS-1 does not know his government name**,** but refers to him as "New Balance" because the adult male habitually wears New Balance sneakers. CS-1 described "New Balance" as having a medium-brown complexion and estimated that he is in his mid-to-late forties or early fifties. CS-1 said that "New Balance" is instructed by OGMAN to sell user quantities consisting of "dime" and "twenty" bags of crack cocaine to the customer base that inhabit the intersection of Shelton Avenue and Goodrich Street daily. According to CS-1, OGMAN provides "New Balance" with a "tennis ball sized" bag of crack cocaine at the beginning of the day then replenishes the quantity or "re-ups" as "New Balance" sells the product throughout the day. CS-1 stated that OGMAN returns to "New Balance" anywhere from one to three times a day to replenish his narcotics supply depending on how much has been sold. CS-1 estimated that "New Balance" collects several

hundred dollars per tennis ball sized bag of crack cocaine. CS-1 does not know whether "New Balance" resides at **SUBJECT PREMISES 1** or elsewhere.

89.     CS-1 also described **SUBJECT PREMISES 1** as a multi-family building, and that the family living on the first floor of the building are "regular," "working" people who are otherwise entirely unassociated with the sale of narcotics and "keep to themselves" to avoid any narcotics activity going on in the immediate area. CS-1 made the distinction that the first floor of the residence is accessed through the "door on the right" when one is viewing the residence from the street. "The door on the right" is labeled with the number "427" affixed to the exterior wall just off to the right of the door. Conversely, the door to the left is labeled with the number "429" that is also affixed to the exterior wall to the right of the door. CS-1 said that the left door labeled with "429" leads to a stairwell feeding to the second and third floor interior dwellings. CS-1 also stated that a drug user named "Rizz" lives at **SUBJECT PREMISES 1**, and CS-1 understands that "Rizz" allows OGMAN to use **SUBJECT PREMISES 1** as a stash location in exchange for narcotics.

90.     CS-1 said that in the past a firearm has been kept nearby on the property in the event "New Balance" needs access to it. CS-1 stated the specific location has varied from being stored outside near the driveway to hidden inside of the residence. The exact, status and location of the firearm is currently unknown to CS-1.

## Additional Information Pertaining to Subject Premises 2

91.     **SUBJECT PREMISES 2** is a second-floor apartment located at 244 Shelton Avenue inside the 242-248 Shelton Avenue multifamily dwelling in New Haven, Connecticut.

92.     Based upon on my training, experience, the totality of this investigation and my knowledge of it, along with coordinated surveillance and controlled purchases, I believe a) that **SUBJECT PREMISES 2** is OGMAN's primary residence; and b) that evidence of drug trafficking offenses, including but not limited to controlled substances, residue of controlled substances, as well as drug packaging material and paraphernalia are located within **SUBJECT PREMISES 2**.

93.     This belief is based upon the totality of the investigation, including but not limited to my training and experience, physical surveillance and the multiple controlled purchases, mentioned above, where OGMAN was observed entering **SUBJECT PREMISES 2** building after selling narcotics to CS-3.

94.     OGMAN is believed to occupy **SUBJECT PREMISES 2** with his mother since his release from prison. Phone ping GPS information has found OGMAN to spend the majority of his time in the area of **SUBJECT PREMISES 2**.

95.     Also, on April 26, 2024, information obtained from a United Illuminating subpoena revealed that Julia MCFADDEN, OGMAN's mother, was listed on the electrical bill for **SUBJECT PREMISES 2,** identified as a second floor unit.   Furthermore, OGMAN has **SUBJECT PREMISES 2** listed as his address on his Connecticut License paperwork.

96.     Furthermore, upon a search of Federal Bureau of Investigation databases, it was revealed that Julia MCFADDEN was present at **SUBJECT PREMISES 2** on March 28, 2012 when the FBI executed a federal search warrant at **SUBJECT PREMISES 2**. During the course of the search, investigators located multiple items of evidentiary value, such as: multiple scales, plates with white powder residue, ammunition, and a large plastic bag encompassing numerous smaller baggies which contained a white rock like substance. During the course of the search,

MCFADDEN told investigators that she lived at **SUBJECT PREMISES 2** with her son, OGMAN.

97.     McFadden's and OGMAN's occupation of **SUBJECT PREMISES 2** was reaffirmed over the course of the controlled purchases and through surveillance and a trash pull conducted on April 29, 2024 outside **SUBJECT PREMISES 2**.  Specifically, on April 29, 2024, at approximately 10:00 A.M., SA MacNamara and SA Lugo established surveillance in front of **SUBJECT PREMISES 2**. Upon arrival at **SUBJECT PREMISES 2**, SA MacNamara observed an older black female with black hair sitting on the front porch of the residence. As the surveillance continued, SA MacNamara observed the same black female walking in and out of the left door "242" and "24", potentially "244."  The black female loaded unknown items into the back of a Ford SUV before departing the area. SA MacNamara conducted a DMV search of Julia MCFADDEN and obtained a license photo of MCFADDEN and confirmed MCFADDEN as the black female that he observed sitting on the front porch.

98.     At approximately 12:13 P.M., SA MacNamara observed that both doors of the multifamily residence were closed. SA MacNamara momentarily looked away from the residence, and seconds later, observed a black male, resembling OGMAN, wearing a white shirt and a baseball style hat walk down the front porch steps of **SUBJECT PREMISES 2**. Additionally, SA MacNamara observed that the left door, marked with a "242" and "24", potentially "244," was ajar. The black male entered the rear passenger's side of a white Kia sedan, the sedan began to travel southbound on Shelton Avenue, out of view of SA MacNamara.

99.     At approximately 10:05 A.M., shortly before agents observed OGMAN leaving **SUBJECT PREMISES 2**, GPS location data placed OGMAN's phone in the area of Dixwell Avenue and Ivy Street (the radius encompassed **SUBJECT PREMISES 2**). At approximately

12:20 P.M., GPS location data placed OGMAN's phone in the area of Hudson Street and Whalley

Avenue. Based on the GPS location data transitioning from the area of **SUBJECT PREMISES 2**

to Whalley Avenue and Hudson Street and the black male's resemblance to OGMAN, confirmed

to investigators that OGMAN was the black male who that exited  **SUBJECT PREMISES 2** and

entered the white Kia.

100.     On April 30, 2024, at approximately 3:00 A.M,, members of the DEA Task Force

conducted a trash pull at the multi-family dwelling located at 242-248 Shelton Avenue, New

Haven  (in which **SUBJECT PREMISES 2** is located). Law enforcement officers transported the

items to 710 Sherman Parkway to examine of the collected bags. During the examination of trash

obtained from the receptacles located in front the multi-family dwelling located at 242-248 Shelton

Avenue, investigators recovered the following from a particular trash bag:

      a.   four plastic sandwich bags containing a white powdery substance. Once transported

          to the NHDO, one of these plastic baggies was field tested by SA MacNamara

          which netted a positive result for the presence of cocaine.   The residue was

          submitted to the DEA lab and confirmatory lab testing is still pending.

      b.   twenty-four (24) clear plastic baggies all precisely cut at the corner of each bag.

          This practice is consistent with the packaging of smaller quantities of drugs relative

          to street narcotics sales. Drugs are placed into a plastic baggie, secured in a corner

          with a small elastic band and then cut with a scissor. The result is a small plastic

          knot of drugs suited for distribution on the street.

      c.   one "DirectPay" Visa Debit card with "DON OGMAN" printed on the front,

          located in the same bag of trash that the two aforementioned exhibits were found

          in.

101.    In a separate bag pulled during the trash pull, investigators found a mailing advertisement addressed to MCFADDEN at the address "244 Shelton Avenue" (S**UBJECT PREMISES 2**), confirming that MCFADDEN also currently resides at **SUBJECT PREMISES 2**.

## VII.   EXECUTION OF THE WARRANTS

102.    The undersigned anticipates executing the warrants between the hours of 6:00 a.m. and 10:00 p.m. and therefore does not request express authorization to execute the warrants sought herein at any time of the day or night, although it is believed, based upon the information contained herein, such authorization is supported by good cause.

103.    Separate and distinct Attachments A documents, describing the Subject Premises to be searched (and including one or more photographs of the premises) are also attached to the applications and search warrants. Separate and distinct Attachments B documents, describing the items believed to be contained within the Subject Premises to which the attachment pertains, are attached to the applications and search warrants.

104.    It is further requested that this affidavit be filed under seal until further order of the Court as the investigation is continuing, and, it is my belief that, based upon the details of the investigation set forth herein, disclosure at this time could compromise the safety of law enforcement authorities conducting the investigation and those who will effect the anticipated arrests and searches, and the ongoing investigation itself, by, including but not limited to, causing targets to flee or destroy evidence if they were to be alerted to the contents of this affidavit.


_____
Alex MacNamara
DEA Special Agent


SUBSCRIBED and SWORN to me by telephone in accordance with the requirements of Fed. R. Crim. P. 4.1 on this \_\_\_\_ day of May, at New Haven, Connecticut.


_____
HONORABLE ROBERT M. SPECTOR
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A-1**

**Location to be searched (SUBJECT PREMISES 1)**

**SUBJECT PREMISES 1** is the second floor unit located at 429 Shelton Avenue, New Haven, Connecticut.  The Subject Premises is located on the second floor of a three-story light-colored building.  The entrance to the second story of the building, is located through the left door marked "429."



**ATTACHMENT A-2**

**Location to be Searched (SUBJECT PREMISES 2)**

**SUBJECT PREMISES 2** is a second floor unit with address 244 Shelton Avenue, New Haven, Connecticut.  Subject Premises 2 is located within in a brown multifamily structure and accessed through the left door marked with black numerals "244"on a mailbox to the right of the door.





2

## **ATTACHMENT A-3**

Apple iPhone assigned phone number 678-306-9517, utilized by Donald OGMAN.

## **ATTACHMENT A-4**

Apple iPhone assigned phone number 475-318-2671, utilized by Donald OGMAN.

**ATTACHMENT B-1**

**DESCRIPTION OF ITEMS TO BE SEIZED**
**("Subject Premises 1" – 429 Shelton Avenue, New Haven, Connecticut)**

The items to be seized are evidence, contraband, fruits or instrumentalities of violations of 21 U.S.C. § 841(a)(1), (b)(1)(B), and (b)(1)(C) (Possession with Intent to Distribute and Distribution of Narcotics) (the "Target Offenses"), namely:

1.     Controlled substances, including, but not limited to, methamphetamine, cocaine, and cocaine base, or other counterfeit narcotics, in any form, including residue of these controlled substances;

2.     Any contraband, quantities of narcotics, scales, funnels, sifters, grinders, cutting agents and dilutants, and drug packaging materials including plastic bags and heat-sealing devices;

3.     Firearms, ammunition, magazines, and other contraband;

4.     United States currency, money orders and other financial instruments;

5.     Records, in any form, including but not limited to drug ledgers, books, receipts, notes, papers, photographs, and images, relating to the distribution of controlled substances;

6.     Records and items of personal property that tend to identify the persons who reside at, occupy, control, or own the premises that is the subject of this warrant, including but not limited to keys, vehicle titles, tax returns, mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, journals, utility and telephone bills, bank account statements, deposit slips, canceled checks, and other such records, identification documents or items of personal property;

7.     Computers, cellular telephones and storage media used to commit the Target Offenses, including cellular telephones assigned call numbers 678-306-9517 and/or 475-318-2671 being utilized by Donald Charmaine OGMAN;

8.     Records and items relating to income, wealth, and expenditures, including but not limited to money orders, wire transfers, cashier's checks, receipts, bank statements, passbooks, checkbooks, safety deposit box rental agreements and safety deposit box keys;

9.     Records relating to expenditures for personal living expenses, including but not limited to invoices and receipts for expenditures associated with rent, utilities vehicle rentals, food, clothing, entertainment, travel, and other living expenses;

10.    Items of personal property that evidence unexplained wealth, including but not limited to jewelry, diamonds, gems, precious metals, such as gold and silver,

5

high-end televisions, stereo equipment, and other expensive items of personal property;

11.     Records regarding the names, addresses, telephone numbers, and other contact information or identification information of coconspirators involved in the distribution of controlled substances, including but not limited to photographs and images;

12.     Closed containers within which any of the foregoing items may be contained or concealed, including but not limited to, safes, lock boxes, trunks, back-packs, and duffle bags, as well as keys therefore and records pertaining thereto, together with the contents of any such closed containers;

13.     Evidence related to OGMAN's membership or affiliation with the Grape Street Crips, including, but not limited to purple attire, purple accessories, or other items signifying or representing membership or affiliation with the Grape Street Crips, or books, records or correspondence including rosters, documentation of dues, and charters/bylaws evidencing OGMAN's or others' membership or affiliation with the Grape Street Crips.

**ATTACHMENT B-2**

**DESCRIPTION OF ITEMS TO BE SEIZED**
**("Subject Premises 2" – 244 Shelton Avenue, 2nd Floor, New Haven, Connecticut)**

The items to be seized are evidence, contraband, fruits or instrumentalities of violations of 21 U.S.C. § 841(a)(1), (b)(1)(B), and (b)(1)(C) (Possession with Intent to Distribute and Distribution of Narcotics) (the "Target Offenses"), namely:

1. Controlled substances, including, but not limited to, methamphetamine, cocaine, and cocaine base, or other counterfeit narcotics, in any form, including residue of these controlled substances;

2. Any contraband, quantities of narcotics, scales, funnels, sifters, grinders, cutting agents and dilutants, and drug packaging materials including plastic bags and heat-sealing devices;

3. Firearms, ammunition, magazines, and other contraband;

4. United States currency, money orders and other financial instruments;

5. Records, in any form, including but not limited to drug ledgers, books, receipts, notes, papers, photographs, and images, relating to the distribution of controlled substances;

6. Records and items of personal property that tend to identify the persons who reside at, occupy, control, or own the premises that is the subject of this warrant, including but not limited to keys, vehicle titles, tax returns, mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, journals, utility and telephone bills, bank account statements, deposit slips, canceled checks, and other such records, identification documents or items of personal property;

7. Computers, cellular telephones and storage media used to commit the Target Offenses, including cellular telephones assigned call numbers 678-306-9517 and/or 475-318-2671 being utilized by Donald Charmaine OGMAN;

8. Records and items relating to income, wealth, and expenditures, including but not limited to money orders, wire transfers, cashier's checks, receipts, bank statements, passbooks, checkbooks, safety deposit box rental agreements and safety deposit box keys;

9. Records relating to expenditures for personal living expenses, including but not limited to invoices and receipts for expenditures associated with rent, utilities vehicle rentals, food, clothing, entertainment, travel, and other living expenses;

10. Items of personal property that evidence unexplained wealth, including but not limited to jewelry, diamonds, gems, precious metals, such as gold and silver,

high-end televisions, stereo equipment, and other expensive items of personal property;

11.     Records regarding the names, addresses, telephone numbers, and other contact information or identification information of coconspirators involved in the distribution of controlled substances, including but not limited to photographs and images;

12.     Closed containers within which any of the foregoing items may be contained or concealed, including but not limited to, safes, lock boxes, trunks, back-packs, and duffle bags, as well as keys therefore and records pertaining thereto, together with the contents of any such closed containers;

13.     Evidence related to OGMAN's membership or affiliation with the Grape Street Crips, including, but not limited to purple attire, purple accessories, or other items signifying or representing membership or affiliation with the Grape Street Crips, or books, records or correspondence including rosters, documentation of dues, and charters/bylaws evidencing OGMAN's or others' membership or affiliation with the Grape Street Crips.

## ATTACHMENT B-3

All records contained in **TARGET TELEPHONE 1** listed in Attachment A-3 to include the following:

1.  the telephone number, ESN number, serial number, and SIM card number of **TARGET TELEPHONE 1**;

2.  the numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images stored in the memory of **TARGET TELEPHONE 1**;

3.  descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, the above-described crimes (violations of 21 U.S.C. §§ 841(a)(1) , (b)(1)(B), and (b)(1)(C), and 843);

4.  any and all records, however created or stored, which tend to demonstrate ownership and use of **TARGET TELEPHONE 1**, and identification bearing the name or photograph of any person, telephone-books, address books, date books, calendars, personal files, and photographs of persons contained in **TARGET TELEPHONE 1**;

5.  any and all evidence showing or tending to show the identity of the maker or user of the data and information contained in **TARGET TELEPHONE 1**, such as passwords, sign-on codes, and program design;

6.  GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;

7.  saved searches, locations, and route history in the memory of **TARGET TELEPHONE 1**;

8.  internet browsing history, to include, internet searches in the memory of **TARGET TELEPHONE 1**;

9.  any and all evidence relating to instant messaging applications or programs on **TARGET TELEPHONE 1**;

10. images and videos in the memory of **TARGET TELEPHONE 1**; and

11. evidence of user attribution showing who used or owned **TARGET TELEPHONE 1** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of

evidence in whatever form and by whatever means they may have been created or stored, including

any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

It is specifically authorized that stored electronic information, data, information and images contained in the above-described **TARGET TELEPHONE 1** may be reproduced by printing said stored electronic information or otherwise reproducing said stored electronic information, by converting said stored electronic information, or by copying said stored electronic information into storage in another device/s.

## ATTACHMENT B-4

All records contained in **TARGET TELEPHONE 2** listed in Attachment A-4 to include the following:

1. the telephone number, ESN number, serial number, and SIM card number of **TARGET TELEPHONE 2**;

2. the numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images stored in the memory of **TARGET TELEPHONE 2**;

3. descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, the above-described crimes (violations of 21 U.S.C. §§ 841(a)(1), (b)(1)(B), and (b)(1)(C),  and 843);

4. any and all records, however created or stored, which tend to demonstrate ownership and use of **TARGET TELEPHONE 2**, and identification bearing the name or photograph of any person, telephone-books, address books, date books, calendars, personal files, and photographs of persons contained in **TARGET TELEPHONE 2**;

5. any and all evidence showing or tending to show the identity of the maker or user of the data and information contained in **TARGET TELEPHONE 2**, such as passwords, sign-on codes, and program design;

6. GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;

7. saved searches, locations, and route history in the memory of **TARGET TELEPHONE 2**;

8. internet browsing history, to include, internet searches in the memory of **TARGET TELEPHONE 2**;

9. any and all evidence relating to instant messaging applications or programs on **TARGET TELEPHONE 2**;

10. images and videos in the memory of **TARGET TELEPHONE 2**; and

11. evidence of user attribution showing who used or owned **TARGET TELEPHONE 2** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

It is specifically authorized that stored electronic information, data, information and images contained in the above-described **TARGET TELEPHONE 2** may be reproduced by printing said stored electronic information or otherwise reproducing said stored electronic information, by converting said stored electronic information, or by copying said stored electronic information into storage in another device/s.